Okay, I'm John Ferro. Morning, I'm John Ferro. I'd like to reserve a few minutes for rebuttal. This case is about nuclear safety and making rational decisions about it. In 2004, NRC and DOT exempted millions of cubic yards of radioactive waste from the regulations that govern transportation safety. Those are regulations regarding packaging, placarding, radiation exposure, reporting accidents, shipping papers, providing emergency information, providing security plans. To comply with NEPA in this, NRC prepared two pages of environmental assessment on the exemption decision. We think NRC failed its obligation under NRC to find out how the regulations would actually affect the public. It's important that this, you understand, this is not a substantive challenge to the NRC's rules. We do disagree with the rules substantively, but this case is a claim under NEPA, a claim that NRC failed to develop the information it needed. We think if NRC had developed this information, it would have ruled differently, but this is a NEPA claim. And at its core, this is a claim about moving around millions of cubic yards of radioactive waste that causes cancers. Our fundamental claim is that NRC should have prepared an environmental impact statement because the number of intensity factors in deciding whether to prepare an EIS. Counsel, before we get to the merits and whether or not the agency took a hard look at the science here, can we address standing? Yes. NRC raised standing in their opening brief, and we submitted declarations indicating that our members met the elements of injury, in fact, procedural injury recognizable under NEPA cases. We refer you to public citizen versus DOT in that regard. We think that the elements of causation and redress are relaxed under NEPA claim, and we think we met the requirements of the organization. But how relaxed? Don't you still have to show a concrete and particularized injury? Under a procedural injury, the failure to do the NEPA investigation may have a consequence with regard to the decision. We don't have to prove that the decision would have been different. It just may have been different. And we think that that satisfies the causation requirement, and we think that redress The injury requirement, injury in fact, and the concreteness of injury is what I'm concerned about. Obviously, we all probably have done a lot of these NEPA cases, and I understand the relaxed standard. But here are the declarations. I'm having difficulty seeing how these declarations support a finding of a concrete injury when all we're talking about is concerns. It seems like every, I mean, even, were you just talking about the Mexican trucking case when you said, which was reversed, and I know. On different grounds. Right, on different grounds. I know, Sandy was not, but I'm very familiar with that case, and even there, I, you know, there was much more particularized, individualized, and concrete injury. For example, the allegations were that the, bringing the Mexican trucks over the border would result in less clean air, not meeting the clean air standards of California, and people would get emphysema, and there would be this, and allergies, and all the things that people in Southern California are suffering anyway. So there, it was a much more particularized statement. Thank you. We submitted declarations on behalf of two kinds of members of the public. Members of the public who simply share the roads, share the rail system, and who will receive collective doses of radiation from sharing the roads with this waste transportation. There is a geographical nexus. The nexus is people who are using the transportation system, and I think that's the requirement here. We also submitted declarations from people who drive trucks. One declaration. One declaration, yes. A member of one of our groups is a truck driver who routinely transports hazardous waste and can transport nuclear waste that's been deregulated without knowing it and suffer exposure from radiation allowable under this rule that is well in excess of any reasonable standard, in excess of the standards of the agencies themselves. The difficulty is that even his declaration, which comes the closest to counting, simply expresses concern that he may be exposed to radiation in a way that is not acceptable from unregulated transportation. It doesn't say anything that I can discern that his exposure will be increased because of this regulation. I believe his declaration So I'm just left very puzzled. Why isn't it simply an undifferentiated concern like we all have about the possibility of being exposed to radiation? That's all he says. He does, he has transported hazardous waste. It does stand to be moving contaminated earth and rubble that has been irradiated and won't know it under this rule because the material has been He doesn't say that. I mean, he just doesn't say it. He doesn't say anything at all about this rule, never mind by comparison with the old rule, never mind by comparison with anything else. He just expresses a generalized concern that he may be exposed. So how does one get any kind of, you know, credible threat of exposure out of that? Well, by the very nature of the action here, a driver is not going to be in a position to know what he's hauling, nor would he have been in a position to know if he'd previously hauled material that was exempt from regulation because there's no requirement that he be notified. He is a truck driver who hauls hazardous waste, and that hazardous waste could very well in the future include exempt material and may very well in the I happen to be driving down the highway at the wrong time. I mean, I guess my point is it seems undifferentiated to me, and it seems unspecific to this regulation. And it doesn't say that his behavior will in any sense be affected. That is, it doesn't say he's going to have to quit his job. It doesn't say he's going to stop driving on the public highways. The assertions of injury, I think, can be read in the record, which clearly indicates that people who are exposed stand to be damaged by this. There is, in the record, evidence that millions of cubic yards of material will be transported, has been transported, and the record establishes that that transport does cause injury, causes cancers, causes non-cancer effects. And it seems to me that that record can be read with these declarations. It's clear that when you move material on the highways, and we're all driving on these highways, and accidents happen, people stop at stoplights next to a truck full of material, there will be exposure. And I don't see why we can't read that in connection with That's what's happening now. So how does this regulation make it worse? Or how would additional injury, to use the language of the law, how is it fairly traceable to the regulation? The government had an obligation when it promulgated the regulation to promulgate a safe one. It identified a radiation dose standard of one millirem per person and then failed to meet that. The hazard is because they didn't prepare an adequate analysis of the effect of the regulation, and we believe if they'd done so, they would have promulgated a regulation that did meet that dose standard. Didn't they prepare an overall analysis that found on average that the exposures under the new regs would be less? So that, for example, if we were looking for a particularized injury for Mr. Dorigo, if he were simply exposed on average, he'd be better off than he is now. NEPA requires that even an environmental action, even an action that is on balance beneficial, still requires an environmental analysis, and may still be significant. Remember, our contention is that they should have prepared an environmental impact statement. We are not making a substantive challenge to the rule, and the question of whether their action was significant, whether there were significant health effects, whether there was uncertainty that should have been examined, and whether there was controversy raised is independent of whether or not the rule is beneficial on balance. It's still not good enough. In terms of Mr. Dorigo's standing and his proof of injury, all we know that he's going to be out there. How do we know that he's going to be suffering any greater exposure than the average, which would be a better situation for him than now? How do we get injury out of his situation? I'm not, I don't believe that in order to show injury, they need to show that the situation has deteriorated. I think they need to show that the regulation was not adequately examined, and that if it had been examined, they would have promulgated a better regulation. The examination can't cure his lack of standing if he doesn't have standing. I mean, you could have the clearest procedural violation. Okay. Some of the, there are 380 radionuclides regulated under this rule. Some of them will be allowed to be transported in substantially higher radiation levels. Some will be less. The average exposure is 23 millirems, well over their 1 millirem standard. But many of the radionuclides will be, allowable levels of radioactivity will increase, and we don't know whether everybody's going to be exposed. The average is just that. Right. Some will increase, some will decrease, and some people will receive additional exposure, some people will receive less. But how do we know Mr. DiRigo is one of those folks who's going to receive a greater exposure than he would currently? And if he isn't, how's the injury? Someone will. Our members are not in a position... You've put in declarations of four specific people to establish standing. Aren't we bound to look at the factual basis that they put forward, not some members, not the forest? It would be difficult for a rule involving the transportation of millions of cubic yards of material over the nation's highway systems for us to anticipate which particular individuals are going to receive higher doses and which are going to receive lower doses. A rule has prospective effect, not retrospective effect. We don't know which person is. I think to hold us to the standard of identifying which people will receive higher doses I think would be very difficult, and I don't think it's a fair test of standing. I think that we've put in evidence that people will be affected, will be harmed, and we've indicated that our members are included in the class of people. Now, on average, some people are going to receive less, some people are going to receive more. We can't anticipate which particular people will be receiving that. Mr. Farrell, I have a related but very different question, and that is, assuming that the Department of Transportation has jurisdiction over the Department of Transportation, I know you don't agree with that, but assume we do not have jurisdiction over the Department of Transportation, and assume that we agree with you in this case that a hard enough look wasn't taken, would an order from this Court in this case to have jurisdiction remanding to NRC to prepare an EIS redress the injury that you see, given that our order could not operate on DOT? Under the regulatory scheme, DOT and NRC independently regulate transportation. NRC's rules bind its licensees. One of NRC's rules is that you have to follow DOT's regulations, but there are independent NRC regulations that are compelled by NRC for material that's not exempt. Should you rule for us and find that your ruling will not bind DOT, nonetheless, NRC licensees will be held to whatever standard NRC has to articulate when they go back and do the EIS. Not to DOT standards? They will be required to meet we don't know what rule NRC will promulgate. What I'm saying is there is a class of people that are independently regulated by NRC whose behavior will be affected if NRC promulgates a different rule, and those are its licensees. One of the rules that binds the licensees. Those NRC, that group of NRC licensees is not subject to the HMRs, the DOT? They are subject by virtue of the fact that NRC makes them subject. One of NRC's regulations is follow DOT rules. Then there is a host of other NRC regulations. Okay. But if we simply issued in this case an order that NRC did not take a hard enough look and, therefore, it has to go back to the drawing boards and prepare an EIS, would that do anything for you? Yes, it would. As a practical matter, DOT, I believe, would, in fact, revisit its rule because of harm of decision. But even if they didn't. Well, I mean, is they out of the goodness of its heart? Well, remember. That's not my question. Right. Okay. Let me get to that second then. First, as I said, there is a – excuse me? I was saying I don't think we should rely on the goodness of the heart of these agencies. I'm not going there, but – It hasn't been a good strategy so far. The NRC licensees are bound to follow whatever determination NRC makes regarding what materials are exempt from transportation regs and which ones are not. They will have to follow DOT's transportation regs if NRC promulgates a new rule and says nothing is exempt. And so they, NRC licensees, would have to follow DOT's regulations even if non-licensees didn't have to follow it because they're only governed by DOT. So there would be effective relief with regards to the class of licensees, independently of that. There would be a class of people out there who are regulated exclusively by DOT. That's right. Who wouldn't be affected. That's correct. And that essentially other government agencies. In addition – Going back to the standing question, sometimes I wonder if it isn't just semantics. I mean, you could possibly have found people who could have put an affidavit saying I would be subject to this increased risk because of specific routes that I drive or because of specific concentrations of nuclear waste adjacent to particular nuclear, I don't know, deposits or whatever, but you didn't. But in a way, it seems like a game because it's just how creative the lawyer is to come up with, to find the people who are affected because somebody will be affected by this in some way. So, I mean, could you have done better declarations, I guess? At this point, it's clear that I could have generated more declarations that would have been more satisfactory to you. I think our declarations meet the requirement, and I think that you're correct that some will receive increased injury and some will not, and that our members, which are, as we represent four large public interest organizations, our members are going to include some who will be exposed more under the new rule than they were under the old rule, and that would include both truck drivers and members of the public. So, but to answer your question, clearly, we should have submitted more declarations just by the nature of your question, but I think our declarations do meet the requirements to show standing. With that, I guess I'll reserve my remaining time. Good morning. I'm Grace Kim, and I represent the respondent of the United States Regulatory Commission. My colleague is John Smeltzer, and he's representing the Department of Transportation in this matter. This is a consolidated case that concerns NRC rule and the DOT rule. We have, you know, we're going to both argue here today in the 20 minutes. I don't know how we're going to quite split the time up, but I guess it depends on the nature of the questions. You just answered the question I just asked, Mr. Terrell. And that is, if we ruled in his favor in this case, but we did not have jurisdiction over DOT, would the DOT regulation still be in place such that people who are subject to NRC licensing would be subject to it? Yes, it would. The short answer is, yes, it would. It would still be in place. Well, would there be any group of people out there who would benefit from a decision in favor of Mr. Ferrer's client in this case? There are two points I want to make on that. Ordinarily, if you remand for lack of a sufficient EA, then the old rule, if you remand and find that a rule is not reasonable, then the old rule would come back into place. And so that, until the time being that the NRC would then do a new impact statement and possibly change its rule. Secondly, the way that the NRC regulations are structured, we basically adopt DOT standards on exemptions. The DOT is, the NRC regulates packaging for much higher levels of radionuclides than the DOT does. And for the lower level radionuclides, DOT actually regulates those packaging. The reason why we have it in our regulations is so that transporters will have a comprehensive picture of the regulations in effect domestically. So even if, let's say, the NRC's regulation were wiped off the books today, the DOT's regulation would still be in effect. The standing questions reflect our belief here that Petitioners do not have standing. In particular, they have not shown any, the rule itself, you know, was a beneficial rulemaking over the previously existing rule. But for some people, for some people. For some people. However, for all we know, the rule could have actually benefited, you know, the trucker and the other members of the public who submitted affidavits could have benefited from the rule. There was no statement or allegation showing, for instance, that there was a disproportionate exposure to a particular radionuclide whose exemption level, which exemption level went up over the pre-existing rule. And that may have been enough to show standing, but there doesn't appear to be anything like that in the four or five affidavits that was submitted. And so. Is that information readily available? That information, well, I would not say it's readily available. However, if there was an information available about what the radionuclides are, that individual presumably would know. But I can't, you know, I can't say that the information is readily available. If I'm a truck driver at Oak Ridge and I know I'm hauling waste, is the information available in the public domain so I could get some idea of what nuclides I'm carrying? Yes. I mean, much of that waste would be, would actually be regulated, is my understanding. It would be a high enough level to be regulated. Some of the radionuclides may be at a lower enough level, but they're all mixed in together. So as a general matter, I think that they would be generally aware of what kind of industries these radionuclides are coming from and what type of things are being transported. So I, that's about all I have to say about standing, other than, you know, they've basically it's a generalized grievance on potential exposure to low doses. So let me ask you a question on the merits. As I read the E.S., it states in only very general and very conclusory fashion that there's no effect on public health or safety without really any explanation or any substantiation behind it. And as I understand your argument, it's primarily, well, but it lurks in the record. I mean, there's the 1977 Generic Transportation E.I.S. and there's the International Agency's study and it's all out there sort of lurking someplace, but it's not in the E.S. So on the merits of it, why in your view does it reflect a hard enough look? Because it doesn't seem to reflect much of a look at all. Well, first of all, the E.A. did identify the dose levels that would go up from the final E.A. did include an appendix C, I believe, that identified all the dose levels. And if you were a scientist, you could look at that and you could, as a lawyer, I may not be able to understand, but you could look at that and you could see that where the dose level changes, where it went up, where it went down. And the E.A. also used the best available data that existed. The most recent transportation study that was done, which I believe was the E.A., it did identify radionuclides that were commonly transported under this transportation data and what their dose levels were and showed that the dose levels would be insignificant. Where does it address the human impacts? I'm sorry? Where does it address the human impacts of all these dose levels? Oh, the dose levels are, oh, you mean what? What will happen if we go with this rule that in some cases increases, in some cases decreases, but what happens to human beings in the United States? The rule itself was premised on existing prevailing opinions on dose levels and the NRC's regulatory standards. Where is it in the E.A.? The E.A. itself did not specifically reiterate what the particular harm would be. It just Isn't it supposed to include it and give a convincing statement of reasons why it does not have to go on to prepare the E.I.S.? Well, we would submit that the Commission itself, in the record, in the rule, very clearly spoke about harm and admitted that doses of radiation that does cause harm to the public, but these low doses, it's within a threshold that, a regulatory threshold that the Commission has had in place and that this rule is not about changing, re-looking at the science behind the health effects of the rule. It was simply to determine whether to go to a better scientific methodology for coming up with an exemption level over the pre-existing methodology, which was the straightforward 70 Becquerel methodology. And the Commission's rule itself was pretty thorough in discussing the impacts of the rule. It made clear that the doses were low in an absolute sense. It's well within order of magnitude of the other regulatory standards out there, despite petitioners' allegations in their brief that it's outside the norm. The doses were, overall, as you recognize, lower than the previous rule. It was based on a scientifically sensible approach. The Commission identified that both where the doses would go up and where the doses would go down, making clear that over the previous rule, it went down by more than 50%. And also that the variation in doses was much less. Under the previous rule, I think the highest level, the impact would have been up to about 230 millirems, whereas under this So the Commission did not, it also explained how they arrived, how this was arrived at and how the dose levels were arrived at and the kind of scientific analyses and modelings that were used, including transportation scenarios. So the Commission did not in any way hide the ball or try to mislead the public, nor did they adopt a one millirem standard. The Commission did not do that. And I invite you to examine the record to clarify that, but they did not adopt a one millirem standard. So the Commission's obligation to adequately consider and disclose to the public the impacts of its rule, which in this case the Commission viewed as being the dose impacts, the doses that would result from the nuclides, the exemption levels that were chosen, was adequate. And the Commission reasonably decided that the rule would not have significant impacts. Okay? My thought is to give him a few extra minutes to talk about the DOT case, and then he'll come back. Is that okay with you? That's great. Can you hear me? Okay. All right. No further questions? Thank you. What I'm going to suggest, you certainly have a little time left for rebuttal on this case, but I'm going to suggest that you take a little extra time to talk about the DOT jurisdiction issue, and then we'll hear from Mr. Smeltzer. Were you going to split the argument? No. As a matter of fact. Okay. If you'd like me to move on then to the other case. Oh, you mean rebut. I mean, you still have some time to rebut. We're just giving you a little extra time to talk about the DOT case. Separately, and then you can rebut later. Okay. I understood that the DOT would be a distinct 20-minute segment. No, it's not. It's consolidated. Oh, I'm sorry. I was relying on the board outside. Okay. Thank you. But you lucked out given the last case. Yeah. We'll give you some extra time. Then I'll just trust you to stop me when it's appropriate, and I would like to briefly speak to some of the issues that the Justice Committee. Why don't you take a couple minutes to rebut, and then we'll give you five minutes or so, I think, on the jurisdiction issue. Quickly on the issue of standing, there is the NRC has its own independent exemption issue, exemption level. It has a set of regulations that regulate conduct of its licensees. Only one of those regulations requires that people also do what DOT says. All of the other NRC regulations will stand or fall with NRC's rule and will govern or not govern its licensees based on what you do today. Second, on this practical matter, we do believe that since the goal here was to harmonization, consistency, to have a uniform set of standards, it's a practical matter. If NRC, who was the agent behind the NEPA compliance, has to redo it, DOT will probably fall in line. On the issue of standing and whether information about radionuclide levels is available, again, I have to repeat, this material is exempt. One of the characteristics of exemption is that a driver has no way of knowing what he's hauling. It's absurd to suggest that he would be able to tell what's in his load. The government themselves claimed, incorrectly, that they couldn't get information about shipments, and I don't understand how they can expect that a driver is going to know what's in his load when it's not even advertised as radioactive. With regard to the hard look and the dose levels, it is clear that there was nothing in the environmental assessment that spoke to the health effects, and it was affirmatively misleading regarding the dose effects. An agency has to defend its FONSI in the environmental assessment. We cited Blue Mountain for that proposition, but not elsewhere in the record. And the environmental assessment states that the criterion adopted is 1 milliram, and it says that the results were found similar, quote, were found similar to the 1 milliram criterion. It only buries the actual doses in the final appendix, the appendix issued to the final EA. It's not in the draft EA. The claims within the final rule that addressed the comments that were raised were also misleading. They said, one person said, what is a significant threshold? You've missed your threshold by a factor of 23 or 42. What do you think is significant? The comment was, we rely on the IAEA. See the background section. It repeats once again that the 1 milliram standard will be met. It's clear that they adopted this standard. It's clear that they didn't meet it, and it's clear that they had an obligation, if they were not going to meet it, to say why and what the relevant standard was. There's simply nothing in the EA and essentially nothing in the final rule that speaks to the health effects. All right, I guess I can move on. We're having a gear shift. A DOT. DOT. Excuse me just a minute. This is a whole different ball of wax, and I apologize for the complexity of these arguments. I don't propose to take you through the legislative history. If I may on that point simply just interject that at least for myself, I found the briefing extremely good on both sides and very helpful, so you did help to make something that is very complex clear. I would agree. The Court certainly appreciates the quality of the work, so go ahead. The issue here is whether this Section 20114 that the government relies on requires exclusive appellate jurisdiction just because this rule happened to have some effect on rail transportation. Our position is that 20114 only applies to actions by the Federal Rail Administration and only those actions that are solely applicable to rail transportation. With regard to the hazardous materials rule, those would be that limited area of jurisdiction the FRA has over rail tankers and inspections. Otherwise ---- Putting too fine a point on it, it seems to me that what you just said, what you've argued, requires rewriting the statute to insert only. And it ain't there. Well, we think that ---- It was. It was. The statute has three incarnations. The original draft, which clearly did contain the word solely and which was revised through what's clearly a drafting error. The second draft, which is the 1992 version of the statute, which basically would have subjected all HMTA actions to Hobbs Act jurisdiction without regard to whether they affected rail transportation or not because there were no language of qualification in the 1992 version. It just said rail actions and HMTA actions. And it's inconceivable that Congress would have buried a jurisdictional provision that had that breadth and deliberately placed it in a statute that applied to FRA action. The third version, the 1992 Act, 1994 Act, has a conflict on its very face. Opening section says this is a non-substantive revision. Section 20114 then provides to add clearly substantive language of qualification. It adds the term as applicable to rail safety to what used to be an unqualified reference to all actions under HMTA. So what does that leave us with? There are three versions of the language. We have to figure out what was intended, and I think that means we have to resort to legislative history and the statutory scheme. Once you do that, you go back and look at what was intended to be accomplished here. And the first rule I think to apply is the mischief rule. You don't interpret ambiguous language beyond the mischief that was intended to cure. The 1976 enactment, which mistakenly, we believe, but regardless of that, mistakenly put FRA action back in review, back in the district court, was something that the labor unions went to Congress and said, fix this. Put the FRA back into the Court of Appeals just like the other modal transportation administrations, the FAA and the Highway Administration. And so Congress said, okay, we'll do that. And they enacted this. That was the mischief that was intended to be cured, not to put all agencies who happened to enact regulation under the Hazardous Materials Transportation Act in front of the Hobbs Act and certainly not to bury that in the rail safety legislation. So I think that we have to look at what Congress intended, and when we do that, the evidence of the drafting error, the evidence of mischief that was intended to be cured, the deliberate placement of it, all speak to the fact that what they were intending to do was to put Hobbs Act jurisdiction just for FRA action and just for the FRA's area of responsibility under the Hazardous Materials Act. FRA only had a limited set of responsibilities there. That's all they intended to cover. The statutory scheme also supports this. When Congress set up direct appellate jurisdiction for Department of Transportation agencies, it did so in very specific forms, and I think we have to follow the expressio unius, exclusio alterius rule of statutory construction. If they mentioned this one, they excluded the others, and they didn't include all actions under the Hazardous Materials Act and they didn't include all actions for RISPA. They've cured this problem now. They've enacted a new legislation since this case was filed. Everything under Hazardous Materials Act now goes directly to the appellate review, except they don't go through the Hobbs Act. The only thing that goes through the Hobbs Act is Section 20114, that limited area that had been carved out for FRA action. Now, if Congress was simply restating the law, they would have put it all under the Hobbs Act. It's not under the Hobbs Act. Congress said we're going to put action under Hazardous Materials Transportation Act in direct appellate jurisdiction, but because the FRA has goes through this separate track, Hobbs Act jurisdiction, we'll leave that there. The new legislation clarifies, changes the situation, makes this jurisdictional question essentially move for all purposes in the future. And for that reason, we suggest that you resort to, I think, your authority on a prudential basis to simply take concurrent jurisdiction. It's a unique question. The way you decide this will not have any consequence for this agency, for these actions in the future. We think the Rood case, which Judge Patel cited below, actually contains the language that you can rely on. It's clear that Federal courts can find jurisdiction for prudential reasons. And in this case, we think that the concerns of judicial economy and the concerns of not having a conflicting outcome would suggest that you go ahead and take jurisdiction. Failing that, we suggest that you remand to Judge Patel and ask her to decide it in accordance with whatever you decide on the merits here, since I think it will clearly bind her. Okay, thank you. Mr. Smoltzer. Good morning, Your Honors. Thank you. May it please the Court. I am here principally to represent the Department of Transportation on the jurisdictional issues, but I am also on the brief for the United States' respondent in the NRC case. So if there are other questions, I know that procedurally we've kind of shifted things here. If there are questions. I can answer the same question if you want to, which is if we ruled in favor of NRC and the NRC, if we ruled against the NRC in the NRC case and ruled in favor of DOT in this case, would there be a gap left and would DOT's regulations stay in place? The DOT regulations would stay in place. And, of course, as we've explained to the Court, the regulations actually show an improvement over the existing safety levels. Apart from that. So they would, well, the DOT rule would set the. Would DOT's regulation be totally co-expensive with the reach of the NRC regulation? It's my understanding that NRC licensees are required to comply with DOT rules as well. So the improvement that is set out in the DOT rule would, the NRC licensees would be subject to that in any interim period, depending on what this Court were to do with the NRC rule. Of course, this Court, even if it rules against NRC, isn't obligated to set aside the NRC rule. Again, for equitable reasons, the NRC rule represents an improvement. I don't know if that clarifies the circumstance. I just wanted to know the simple question. Okay. Why don't you shift gears to the jurisdiction issue? I wish we had an EIS so that I would know, so I would better understand how this improvement to health actually exists and that you keep representing as a result of this rule. Right. I don't think there's dispute among the parties that the average dose from this rule change is going down. The question is, in the context of this rulemaking, was there an EIS required for what remains an allowed dose? And both the agencies together submit that, given the context of the rule, that it represents an improvement. The dose for transportation workers, which is a conservative dose, is way below normally occurring background radiation, which we're all subject to. All of us annually are subject to about 300 milliramps. The record shows naturally occurring background radiation. So the question is, how do you, you know, analyze that additional 23, you know, that everybody agrees from the new rule is going to come up? And what the agency said is, in the context of this rulemaking, which, again, it didn't start as a rule. Mr. Ferro is getting exasperated, and I am a little bit. Well, Your Honor. Because here, let me just try to say this. We're trying to organize the argument in a way that makes sense. And we are now focusing on the DOT jurisdiction case. So I keep trying to suggest that you stay off of the underlying merits, which have been fully argued. Because Mr. Ferro, otherwise, is going to stand up and want to respond to everything that you say. I appreciate it. Which is now finished. I appreciate that, Judge Reimer. And the reason I was trying to respond to Judge Wardlaw's question, and Ms. Kim used about 10 minutes of her time, and in fairness, they had more of an opportunity to address the substance. But let me turn to the jurisdictional question. Again, there's no disagreement that really what this is about is interpreting Section 2114C and whether that jurisdictional provision applies to the rulemaking in this case. And as Your Honor pointed out, the rulemaking says that any regulation, any rule, or the statute says that any rule issued under the Hazardous Materials Transportation Act that's applicable to railroad safety is subject to the exclusive jurisdiction of the Court of Appeals. And we submit that this Court ought to apply the rule as it's written. And Congress did not write in that limitation. Mr. Ferro argues that to do so doesn't make sense. Well, I'm not sure that's really what Mr. Ferro is arguing. Because as a policy matter, I did not see in their briefing the argument that it's unsound to have this kind of multimodal rule brought to the Court of Appeals or that it's unsound for Congress to choose when seeking to get railroad safety rules. Of course, give any kind of we can't rewrite the rule just to make it sensible in a policy sense. But I understand them to be saying, look, it's just not drafted to say what it meant, obviously. Right. And what I'm saying is that's exactly the point. You cannot rewrite the rule for a policy reason. There is a standard that says, well, if the statute is unsound as a policy matter on its face and therefore Congress could not have meant that policy result, then the Court maybe has a reason to be concerned. But our first point is if you look at this the way the literal language slices the jurisdictional pie and says these classic cases go to the Court of Appeals and these classic cases go to district court, there's absolutely nothing unsound about that policy judgment and no reason to depart from the literal language, you know, based on some sort of, you know, Congress couldn't have possibly intended this because, you know, Congress turned around and then added even more, you know, cases that come through the Hazardous Materials Transportation Act to the Court of Appeals. So, I mean, that just doesn't that logic doesn't follow. And so really exclusively what the petitioners or the appellants rely on in this circumstance is their reading of the legislative history to suggest that there was this particular narrow purpose. But, again, the language that they would have had this Court or would have this Court impose in this case, the language of restriction that termed solely was in a draft bill, you know, the original draft that came out in 1992 that Congress rejected. And they rejected it not once in 1992 when they passed the original legislation, but they rejected it again in 1994 when they made this recodification and change to the laws. Mr. Farrow suggested that there's somehow a conflict in the 1994 legislation between the statement that we are just recodifying without substantive change and the addition that was put in the rule that says applicable to railroad safety. And, Your Honor, that doesn't make any sense. What we concede is that there may have been an ambiguity in the original 1992 rule where it had said nothing about applicable to railroad safety and it was clear that this was part of a railroad safety law. But the clarification that this is applicable to railroad safety isn't a change. It's just a clarification and there's no conflict there. And what is clear is if Congress wanted to put this restriction, this limitation, that's solely applicable to railroad safety, I mean, they had that draft on the table, right? If that's what they want to do, they just go back. It was just two years before. They pull that language back and they stick it right in. But they deliberately did not do that. And I think that, you know, the typical canon of statutory construction is where Congress intentionally, you know, foregoes a particular limitation that was proposed and then rejected. The rule is it's presumed to be intentional. And further on the question of legislative history, there is nothing, there is no particular statement in legislative history that they point to in a committee report or any member's statement or anything where in the legislative history there's some sort of comment, well, what we intended to do when we said applicable to railroad safety was only address, you know, those things that are applicable solely to railroads and not these multimodal rules or to only address issues of the federal rules promulgated by the Federal Rail Administration. There's none of those kind of statements. There's just these general statements that refer to actions of the Secretary of Transportation in the area of railroad safety. And we submit that, at best, the legislative history is ambiguous. And what the appellants are asking you to do is rewrite the rule on a policy rationale to stick something in there that's not there where the typical canons of statutory construction would say that that's not to be done under this circumstance. Okay. Thank you very much. Thank you. Mr. Farrell. Just briefly, the 1994 legislation was a recodification, and there's essentially no legislative history that speaks to the issue. The conflict we see in the 1994 legislation is that it states, on the one hand, that this is nonsubstantive revision, and on the other hand, it makes a substantive revision. That conflict constitutes the kind of ambiguity that demands resort to legislative history to resolve. When you do resort to the legislative history, nothing points to the reading that they have suggested. The original draft in 1992 is clearly and admittedly flawed. You need to look at the legislative history then to figure out what they were trying to do. And when you do that, I submit that all of the indicators point in the direction that the FRA was being regulated, not any other agency within the Department of Transportation, not RISPA in particular. Congress knew that the FRA's role was limited, that they only were involved in hazardous materials transportation regulation in two areas, and Congress revised the draft of the 1992 version at the suggestion of the Secretary of Transportation to simplify what was a long recitation of Railroad Safety Acts. The original draft said solely applicable to railroad safety. They simplified that by taking an entirely unrelated statute, a whistleblower statute, and saying, let's just use the language there for railroad safety actions. That will take care of it. Well, that whistleblower statute was not drafted with the kind of precision that they could rely on to say, oh, yes, they meant, but when they decided to parse this jurisdictional issue to include all actions that touched on railroad regardless of whether they were exclusively. It's just an error. It's clear that it was an error. The legislative history makes that clear. So we submit that you have to resort. What is the policy rationale behind having a concurrent, reading it to be a concurrent jurisdiction statute? Well, we suggest, our fundamental argument is that 20114 requires that district court have jurisdiction. We submit, and we've been trying to consolidate this case because we recognize that there is a policy rationale for hearing this case in one forum, judicial economy, possibility of conflicting resolutions. We moved this court to transfer this case to the district court when we believed that we were correctly in front of the district court. We briefed and moved that this be transferred under a Hobbs Act provision that allows you to transfer a case down to a lower court for fact-finding. The NRC case? Yes. You moved it that way? Yes, and this court ruled against us on that but said that we had leave to reopen it. We then later moved to consolidate these two issues. We wanted to get it in one forum. We recognize that it makes sense that this be resolved in one forum, but we don't believe that we made a mistake in filing in the district court. We believe that there was no clear path to review, and we filed in the proper court, and we think that the legislative history supports that decision. And for us to be denied jurisdiction entirely given the legislative history and the clear intent or the intent of Congress. Well, you could have filed in this court had it been in time. Right, and we had no reason to think we needed to file in this court and therefore no reason to think that it was important to wear a belt and suspend or to meet a jurisdictional time limit that is not applicable. And so we think we properly filed in the district court. We only invite you to exercise your discretion to exercise concurrent jurisdiction because we don't believe there's anything that bars you from doing that. And if you want to decide both cases on the merits, we invite you to do so. If you don't, then we suggest that you remand to Judge Patel because we think that the Section 20114 was not intended as a global grant of Hobbs Act jurisdiction in the history that we've set forth. Okay, Mr. Carroll, thank you. Ms. Kim Smolter, thank you. The matter, I just argued, will be submitted and the court will abstain at recess for the day.
judges: Rymer, Wardlaw, Selna